Steven H. KORMAN, et al.

v.

**TRUSTHOUSE FORTE PLC, et al.**

Civ. A. No. 89-8734.

United States District Court,
E.D. Pennsylvania.

Jan. 31, 1992.

Barry E. Ungar, Larry H. Spector, Rachel B. Mann, Mann, Ungar & Spector, Philadelphia, Pa., for plaintiffs.

Maura E. Fay, William J. Leonard, Dilworth, Paxson, Kalish & Kauffman, Stephen J. Mathes, Philadelphia, Pa., for defendants.

## MEMORANDUM

BARTLE, District Judge.

This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* This Court, through Orders of Judge Herbert Hutton dated June 14, 1990 and January 10, 1991, has previously dismissed much of plaintiffs' Amended RICO Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. (D

App "B" pp. 10–18; D App "D" pp. 5–13).[1] Only a portion of plaintiffs' claims brought under § 1962(c) of RICO remains for adjudication.

Following the completion of extensive discovery, defendants Trusthouse Forte PLC, Trusthouse Forte, Inc. and Forte Hotels International, Inc. (collectively "Trusthouse") have filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure asking this Court to dispose of the remainder of plaintiffs' Amended RICO Complaint.

The plaintiffs include a number of members of the Korman family, including Steven H. Korman ("Mr. Korman"). Mr. Korman and his family own and operate an extensive residential commercial and industrial real estate enterprise which is the largest landlord in the Philadelphia metropolitan area. (D App "E" p. 55).

The focus of this action is an apartment building known as The Plaza Apartments ("Plaza"). The Plaza is located at 18th Street and Benjamin Franklin Parkway in Philadelphia. (Id. at pp. 7, 55). When the Plaza was constructed in 1963, it was the principal asset of the Plaza Partnership ("Partnership"), a Pennsylvania limited partnership. (Id. at pp. 7, 43). The named plaintiffs have at varying times been either general or limited partners in the Partnership and have owned all or part of the Partnership since 1963.

In 1968, Mr. Korman, who has a college degree in business and who is sophisticated in complex real estate and business matters, assumed control of approximately 100 separate rental apartment buildings owned by the Korman family.[2] (Id. at pp. 7, 52, 54–55). One of the apartment buildings for which Mr. Korman was responsible was the Plaza. In 1968 Mr. Korman also became vested with the authority to make all busi-

---

1. 'D App' refers to the Appendix which defendants submitted along with their motion for summary judgment. The letter within the quotation marks refers to an Exhibit in the Appendix.

2. Prior to assuming responsibility for the family's extensive rental apartment holdings, Mr. Korman ran the family's Frankford Supply

Company, which at the time had gross sales of $10 million and had a staff of 150 employees (Id. at p. 255). Subsequent to 1968, in addition to managing his family's apartment buildings, Mr. Korman ran the purchasing, advertising and house sales segments of his family's real estate business. (Id. at pp. 256–57).

ness decisions on behalf of the other plaintiffs in connection with the operation of the Partnership. Since that time only Mr. Korman has been involved in its management. (Id. at pp. 16–17).[3] Because of this authority, it was Mr. Korman who dealt with the defendants and negotiated and executed the contracts with the defendants that are the subject of this lawsuit. (Id. at p. 9).

Plaintiffs were 100% owners of the Partnership from approximately May, 1963 to December, 1977. (Amended Complaint, ¶¶ 9–11). On January 1, 1978, Nina Number Five, N.V., a Netherlands Antilles Corporation ("Nina Five"), agreed to purchase 50% of plaintiffs' interest in the Partnership for $3.3 million. (D App "E" pp. 100, 107–08, 126–27, 352). During the negotiations for the purchase, both sides were represented by counsel.[4]

It was shortly thereafter that Mr. Korman conceived of an idea to convert the Plaza apartment building into a "world-class" or "first-class" hotel. (Id. at pp. 59, 130). After obtaining the approval of partner Nina Five, and after consulting with his law firm, Wolf, Block, Schorr & Solis–Cohen ("Wolf, Block"), Mr. Korman, on behalf of the Partnership, entered into discussions with different European companies regarding the conversion of the Plaza into a "world-class" or "first-class" hotel.[5] (D App "E" pp. 134, 143, 152–57). Mr. Korman selected Trusthouse, an international corporation which owns and operates over 300 hotels worldwide, to do the conversion. (Id. at pp. 137–39).

After several months of negotiations between Mr. Korman and Trusthouse during which both parties were represented by counsel, the parties entered into written contracts on May 8, 1980. (Id. at pp. 168–69). In addition, Mr. Korman actively participated in drafting the contracts even to the point of personally attending many of the negotiating sessions. (Id. at pp. 170–71, 213). Before signing the contracts, Mr. Korman read through them to make sure they contained all the terms of plaintiffs' agreement with Trusthouse. (Id. at pp. 170–71, 174, 213, 219).

According to the 1980 contracts,[6] Trusthouse was to renovate the Plaza apartment and convert it into the Palace Hotel ("Palace"). Trusthouse would contribute $1.5 million toward the renovations. (Id. at pp. 5–8). In addition, Trusthouse acquired a 5% interest in the Partnership, leaving the plaintiffs and Nina Five each with a 47.5% interest. Trusthouse also agreed to manage the Palace as a "first-class" hotel. (D App "H" pp. 2–3, 27; "E" pp. 2–3, 27).

Subsequently, Nina Five informed Mr. Korman that it wished to sell its 47.5% partnership interest. (D App "E" pp. 340–42). After consulting with his attorneys, Mr. Korman told Trusthouse of Nina Five's interest in being bought out.[7] (Id. at p. 343). Thus, it was Mr. Korman who initiated the contact between Trusthouse and Nina Five and facilitated the transaction which resulted in Trusthouse becoming the majority general partner of the Partnership. Both Mr. Korman and Trusthouse then executed revised contracts ("1981 contracts") to reflect the new balance of interest in the Partnership. (D App "K"). As with the first set of contracts, Mr. Korman

---

**3.** Since the other Korman family members who are plaintiffs were not involved in the decision making of the Partnership and the events underlying this action, plaintiffs will at times be collectively referred to as Mr. Korman.

**4.** Plaintiffs were represented by the law firm of Wolf, Block Schorr & Solis–Cohen who had represented Mr. Korman and his family for 40 years. Nina Five was represented by attorney Robert Montgomery Scott. (Id. at pp. 100–01).

**5.** According to Mr. Korman, the terms "world-class" and "first-class" are interchangeable and refer to the subjective opinion, state of mind and/or emotional feeling of hotel guests that

they are staying in "the best" hotel and are being provided with "great service." (Id. at pp. 22–24).

**6.** The contracts were formally titled "Second Restated and Amended Plaza Joint Venture Agreement" and "Management Agreement" (referred to collectively as the "1980 contracts").

**7.** Plaintiffs did not consider buying out Nina Five's interest themselves, even though they were financially capable (D App "E" pp. 346, 351), and the 1980 contracts granted plaintiffs the right of first refusal in the event Nina Five decided to sell (D App "H" pp. 18–19).

read the 1981 contracts before he signed them. (D App "E" pp. 388–89, 396). During the period of renovation of the Palace, Mr. Korman visited the site once or twice a week and participated in the renovation project. (Id. at pp. 231, 372–74). Trusthouse managed the Palace on behalf of the Partnership until September 25, 1989, when the Palace was sold to a third party. (Amended Complaint, ¶ 40). As a result of that sale, plaintiffs received $11 million for their interest in the Palace. (D App "E" pp. 352–53).[8] According to Mr. Korman, plaintiffs actually profited from their relationship with Trusthouse. The $12 million which plaintiffs received for their interest in the Palace was more than they had initially paid for that interest. (Id. at pp. 352–53).

Plaintiffs instituted a suit in the Court of Common Pleas of Philadelphia County in October, 1987, alleging, among other things, breach of contract, breach of fiduciary duty, and conspiracy. That case, captioned *Korman, et al. v. Knott Hotels Corp., et al.*, Court of Common Pleas, Philadelphia County, October Term, 1987, No. 3158, is generally concerned with the same set of facts and occurrences that are the subject of this RICO action. Even so, it was not until December 7, 1989, however, that plaintiffs brought this RICO action in this Court.[9]

There are three counts (Counts I, II, and III) remaining from the Amended Complaint, each alleging a violation of § 1962(c) of RICO. That section provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1988).

"A § 1962(c) violation requires a finding that the defendant 'person' conducted or participated in the affairs of an 'enterprise' through a pattern of racketeering activity." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 300 (3d Cir.1991). According to the statute, the term "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3) (1988). The term "enterprise" is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1988). The "person" charged with the violation of § 1962(c) must be distinct from the "enterprise." *Brittingham*, at 300–01; *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 633–34 (3d Cir.1984).

■ Counts I and II of plaintiffs' Amended Complaint allege that the three related Trusthouse corporate entities which were named as defendants are also the "enterprise." The counts allege an association-in-fact enterprise consisting of the related corporate Trusthouse defendants. (Amended Complaint, ¶¶ 43, 49). Related corporate entities cannot be named as both the defendants and the enterprise in claims under § 1962(c) of RICO where there is no evidence that the corporate entities (as distinct from the officers and employees acting on their behalf) played a separate role in the alleged racketeering activity. *Brittingham*, at 300–01. There is no evidence that the corporate Trusthouse defendants (as distinct from the officers and employees acting on their behalf) played a separate role in the alleged racketeering activity. Hence, under the *Brittingham* analysis, because the "enterprise" is not suffi-

---

**8.** Plaintiffs had earlier received a $1 million partnership distribution which, when combined with the $11 million proceeds from the sale resulted in a total payment to plaintiffs of $12 million. (D App "E" at p. 353). The $11 million was exactly the amount that plaintiffs had bargained for during the 1981 contract negotiations, and which was specified in the 1981 contracts. (D App "L").

**9.** Trusthouse Forte, Inc. and Forte Hotels International, Inc. are wholly-owned affiliates of Trusthouse Forte PLC. Forte Hotels International, Inc. is the successor in interest to Knott Hotels Corporation, formerly the general partner of the Plaza Partnership. (Amended Complaint, ¶¶ 2–6).

ciently distinct from the defendants, judgment on the pleadings shall be entered in favor of the defendants and against the plaintiffs on Counts I and II of the Amended Complaint.[10]

The enterprise alleged in Count III is the Plaza Partnership (Amended Complaint, ¶ 54) and therefore meets the *Brittingham* requirement that enterprise and defendant be distinct. Defendant seeks summary judgment on this Count on a number of grounds, including the statute of limitations. A four year statute of limitations period applies to RICO claims. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). That limitations period begins to run

> from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed, unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern. In that case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same "pattern."

*Keystone Insurance Co. v. Houghton*, 863 F.2d 1125, 1126 (3d Cir.1988).

■ The elements of a RICO claim are the conducting of the enterprise through a pattern of racketeering and injury in plaintiffs' business or property, *Sedima S.P.R.L. v. Imrex*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Under *Keystone*, when all the necessary elements have occurred to make out a RICO claim and have been or should have been discovered, it appears that the statute of limitations begins to run, even if further predicate acts may occur. The Court in *Keystone* explained:

It would appear fundamental that the four-year statute of limitations for civil RICO may not begin to run until each of the elements of the cause of action exist. Thus, the discovery rule should be modified by applying the "knew or should have known" standard to *each* element of the cause of action, not merely to the injury element. [emphasis in original]

*Keystone,* at 1130.

This reading of *Keystone* is supported by the Court of Appeals recent decision in *Glessner v. Kenny,* 952 F.2d 702 (3rd Cir. 1991). There, in analyzing the RICO statute of limitations, the Court declared:

> We stated that the "last injury discovery rule," under which a claim arises when a plaintiff knows or should have known of his or her injury, cannot be applied to a RICO plaintiff whose knowledge of injury arises solely from a single predicate act because the plaintiff may have discovered the injury but not the pattern. Instead, a plaintiff's limitations period must be measured from the time it knew or should have known of the pattern of racketeering activity. [citation omitted, footnote omitted]

*Glessner,* at 706.

■ Plaintiffs here allege that defendants, through a fraudulent scheme, attempted to acquire a controlling interest in the Palace. Specifically, plaintiffs contend that defendants through wire and mail fraud induced plaintiffs to sign the 1980 and 1981 contracts by misrepresenting to plaintiffs that the defendants would make the Palace a "first-class" hotel while, in fact, they never intended to do so. Also, as a part of the alleged scheme, defendants concealed from plaintiffs their true management philosophy, which plaintiffs claim was to seek only short-term profits. Finally, plaintiffs allege that defendants perpetuated the alleged fraudulent scheme by "lulling" plaintiffs into believing that the Palace was becoming or would become a "first-class" hotel. (Id. at pp. 705–07; Amended Complaint, ¶¶ 14–40).

---

10. Defendants incorrectly moved for summary judgment on Counts I and II. These counts are being decided solely on the pleadings. The proper motion, therefore, is for Judgment on the Pleadings. Federal Rule of Civil Procedure 12(c).

In this case, all the elements of a RICO claim, according to plaintiffs' allegations and statements, had become known by the summer of 1985. Plaintiffs knew of the conducting of the enterprise through a pattern of racketeering activity and had been injured in their business or property by that time. *Keystone*, at 1128. Again, according to plaintiffs, numerous predicate acts through mail and wire fraud establishing a pattern had occurred from 1980 up to the time of a 1985 conversation between Mr. Korman and Rocco Forte, an officer of Trusthouse. (Plaintiffs' Memorandum, p. 15; Korman Affidavit, Exhibit "1" to Plaintiffs' Appendix, ¶ 8). Mr. Korman expressly admitted that he had knowledge of plaintiffs' alleged RICO claims against defendants and plaintiffs' alleged injuries no later than the summer of 1985 when Mr. Korman met with Rocco Forte:

> Rocco Forte flatly told Korman that Trusthouse was not going to spend the money needed to make the improvements [to the Palace] … *Korman now knew that Trusthouse would never complete the conversion* and that he and his partners would never receive any income from the operation of the hotel. His choice was to litigate or to come up with a creative solution. (Emphasis added)

Plaintiffs' Memorandum, pp. 16–17; *see also* Korman Affidavit, Exhibit "1" to Plaintiffs' Appendix, ¶ 8; D App "E" p. 388. The essence of the fraudulent scheme alleged under RICO is Trusthouse's intention never to make the Palace a "first-class" hotel and simply to gain control of the Palace to make a short-term profit. By the summer of 1985, if not by 1981, the fraud scheme, as alleged by plaintiffs, was fully exposed. By 1985 Mr. Korman, a sophisticated businessman, by his own admission, was aware that Trusthouse, by refusing to spend any more money, would not make the Palace a "first-class" hotel and was not in it for the long haul. He "… knew that Trusthouse would never complete the conversion and that he and his partners would never receive any income

from the operation of the hotel." (Plaintiffs' Memorandum, pp. 16–17). Plaintiffs' injuries were fully known by this time. Consequently, there is no question that as of the summer of 1985 at the latest plaintiffs knew "that the elements of a civil RICO cause of action existed." *Keystone*, at 1126.

Plaintiffs' Complaint was filed on December 7, 1989. Since plaintiffs knew of all the essential elements of RICO by the summer of 1985, their claim is barred by the four year statute of limitations. *See Keystone, supra* at 1126.

Even if under *Keystone* the statute of limitations does not begin to run here until the last predicate act occurs "as part of the same pattern of racketeering activity," the action is still time barred under the undisputed facts of this case. Plaintiffs concede that they knew of their alleged RICO claims and their alleged injuries well before December 7, 1985, if not as far back as 1980 and 1981. Mr. Korman stated that shortly after he signed the 1980 contracts he discovered that the information which Trusthouse had provided to him prior to the date of signing was false. (D App "E" p. 192). Trusthouse had allegedly provided him with overstated cash flow projections, understated renovation cost estimates, and inaccurate marketing and promotion information, all prior to May 8, 1980 when the contracts were signed.[11] (Id. at pp. 192–94; Amended Complaint, ¶ 18). Notwithstanding everything that Mr. Korman allegedly learned in 1980 concerning the alleged fraudulent behavior of Trusthouse, Mr. Korman continued to associate with Trusthouse by entering into contracts with Trusthouse in 1981.

In order to avoid the statute of limitations, plaintiffs argue that two predicate acts occurred after December 7, 1985. Both of these alleged acts involved Mr. Korman and a transaction which he proposed with Eastdil, a mortgage banking company with which Mr. Korman had previously done business. (D App "E" pp.

---

11. He facilitated Nina Five's sale to Trusthouse of its 47.5% interest in the Partnership, and immediately thereafter he entered into the 1981 contracts with Trusthouse. (D App "E" pp. 233–34).

398, 403; Amended Complaint, ¶ 31). Surprisingly, Mr. Korman wished to initiate further business dealings with defendants whom he apparently knew as early as 1980 or 1981 and surely by 1985 were "racketeers." In the summer of 1985, after he learned of Trusthouse's alleged fraudulent scheme not to make the Palace a "first-class" hotel, Mr. Korman proposed that Trusthouse join him in a transaction with Eastdil ("Eastdil transaction"). (Id. at pp. 398–400). Two Trusthouse hotels in New York would be sold along with the Palace to Trusthouse Forte Limited Partnership ("Trusthouse Partnership"), a newly formed limited partnership, as part of a $131 million syndication package. Plaintiffs would obtain a 15% limited partnership interest in this new Trusthouse Partnership in exchange for their interest in the Palace, and Trusthouse would receive consideration for selling its share of the Palace and the two New York hotels. Through an underwriting, outside investors would purchase limited partnership interests and thereby fund the transaction. Trusthouse would manage the hotels. As part of the Eastdil transaction, additional renovations would be made to the Palace. (D App "E" pp. 403, 409–10; Amended Complaint, ¶ 32). Plans for the Eastdil transaction never proceeded beyond the preliminary negotiations. (D App "E" pp. 431–32).

As the first Eastdil predicate act, plaintiffs allege that in October, 1986 defendants falsely included in a private placement memorandum for the Eastdil transaction, a representation that "$4 million was being spent on ... capital improvements [to the Palace]." (Amended Complaint, ¶ 28). Plaintiffs allege that documents relating to this $4 million expenditure were sent by mail. (Plaintiffs' Memorandum, pp. 41–42).[12] Second, plaintiffs allege that defendants, during telephone calls with Mr. Korman, fraudulently misrepresented that they would "protect plaintiffs' interests" during the initial meeting in New York to discuss the proposed Eastdil transaction, when in fact defendants had no intention of protecting plaintiffs' interests.[13] (Amended Complaint, ¶ 34).

These alleged predicate acts, from which plaintiffs suffered no injuries, and which plaintiffs allege arise out of the proposed Eastdil transaction, are not part of the "same pattern of racketeering activity" which plaintiffs allege occurred prior to December 7, 1985 and which had as its objective the acquisition of a controlling interest in the Palace.

In order for a predicate act to be part of the same pattern, it must be "related" to, and there must be "continuity" with, the pattern under the two prong test set out by the Supreme Court in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989); *see also, Hindes v. Castle*, 937 F.2d 868, 872 (3d Cir.1991). Neither of the two Eastdil transaction alleged predicate acts meets this test.

The Eastdil predicate acts are not related to the alleged acts of racketeering which plaintiffs claim occurred prior to the summer of 1985, and which make up defendants' fraudulent scheme. The predicate acts occurring prior to 1985 involve only plaintiffs and defendants and their agreements with respect to the Palace. Plaintiffs accuse defendants of fraudulently inducing them to enter into the 1980 and

**12.** It is doubtful that this actually qualifies as mail fraud. The one document to which plaintiffs point is a letter which Trusthouse sent to Mr. Korman on January 31, 1986 "enclosing Eastdil proposals and 'point[ing] out that in preparing the trading forecast, we have assumed that $3.5 million will be spent on capital improvements ...'" This letter, however, was sent by Federal Express, not by U.S. mail. (Plaintiffs' Appendix, Exhibit "62").

**13.** Initially, in his sworn deposition testimony, Mr. Korman stated that it was in a face to face meeting in New York that he was told by a Trusthouse representative that Trusthouse would protect his interests during the Eastdil negotiations. That statement does not qualify as a wire fraud racketeering activity. Recognizing this to be a problem, Mr. Korman subsequently executed an affidavit in which he stated that there were phone conversations after the face to face meeting. Although he could not "recall the specifics of any particular such conversation ..." Mr. Korman stated that the same assurance to protect his interest was given. (Korman Affidavit, ¶ 9).

1981 contracts by misrepresenting that defendants would make the Palace a "first-class" hotel when, in fact, defendants never intended to do so. In the summer of 1985, as stated above, a Trusthouse representative told Mr. Korman face to face that Trusthouse would not contribute any longer toward making the Palace a "first-class" hotel. That revelation ended the pattern of racketeering then and there. It was only thereafter that the proposed Eastdil transaction was proposed, not by Trusthouse, but by Mr. Korman. The alleged racketeering acts of Trusthouse after the summer of 1985 were certainly not designed to lull Mr. Korman into believing that Trusthouse would make the Palace a "first-class" hotel. They had nothing to do with any fraudulent efforts of Trusthouse to make a short term profit. Even assuming without in any way deciding that these two alleged predicate acts would otherwise rise to the level of mail or wire fraud—a doubtful proposition at best—reliance is necessary to establish the predicate act of mail or wire fraud under RICO. *Ferdinand Drexel Investment Co., Inc. v. Alibert,* 723 F.Supp. 313 (E.D.Pa.1989), aff'd, 904 F.2d 694 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 154, 112 L.Ed.2d 120 (1990); *Lentz v. Pan American Corp.,* No. 90–2181, 1991 WL 240739 (E.D.Pa., filed November 12, 1991). Mr. Korman could not possibly have relied on any mail fraud or wire fraud of Trusthouse after the summer of 1985 in connection with any scheme to deceive plaintiffs about making the Palace a "first-class" hotel. Consequently, there were no predicate acts after that time which were related to any predicate act occurring before that period.

Even if there were predicate acts after the summer of 1985 related to those in the preceding period, the proposed Eastdil transaction does not satisfy the continuity requirement needed to make Eastdil part of the alleged pre–1985 pattern.

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. (Citations omitted, emphasis in original)

*H.J. Inc.,* 492 U.S. at 241–42, 109 S.Ct. at 2902.

The Supreme Court further states:

Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.

*H.J. Inc.,* at 242, 109 S.Ct. at 2902.

Recently, in *Hindes v. Castle,* 937 F.2d 868 (3d Cir.1991), the Court of Appeals for the Third Circuit affirmed the dismissal of a RICO complaint for failure to establish continuity and therefore the requisite pattern. In that case Gary Hindes was the unsuccessful Democratic candidate for Lieutenant Governor of Delaware in 1988. Hindes sued the successful Republican candidates for Governor and Lieutenant Governor under RICO alleging a plan whereby the Republicans solicited contributions earmarked for the Governor's campaign and funneled a substantial portion to the Lieutenant Governor's campaign. Such a scheme allegedly required Hindes to spend more than he otherwise would have spent on his campaign. The objective of the alleged fraudulent scheme was the election of Wolf as the Republican Lieutenant Governor as part of the team with the Republican Governor. That goal was accomplished at the end of the election. Since under Delaware law the Governor would not be eligible to run for a third term as part of a team with the Lieutenant Governor, the Court held that the period of time over which the scheme extended was closed when the two Republicans were reelected. The Court then considered whether the scheme threatened any future criminal conduct and stated:

... in this case because the fraudulent solicitation of contributions ended with the election of Wolf [as Republican Lieutenant Governor] in November 1988, and the alleged purpose of the scheme was

achieved with the election of Wolf, the district court properly determined that there existed no threat of continuing racketeering activity.

*Hindes,* at 874.

Likewise, in this case the specific facts do not establish the required continuity between the pre and post summer of 1985 acts. The continuity ended at the latest in the summer of 1985 when Rocco Forte told Mr. Korman that Trusthouse was not going to spend the money needed to make the improvements to the Palace. Again, once the defendants in effect conceded the alleged fraudulent design and Mr. Korman, an experienced businessman represented by counsel, was well aware that defendants were "racketeers," the pattern of racketeering came to an end. Realistically, no further predicate actions or threat of predicate acts in the same pattern of racketeering activity could occur.

The Court of Appeals has noted that Congress intended 'a natural and common sense approach to RICO's pattern element.' *Marshall–Silver Construction Co. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990). In this case, "common sense" dictates that the alleged scheme, including the pattern of racketeering, ended when the scheme was fully exposed in the summer of 1985.

Accordingly, since no injury or predicate act involving the pattern of racketeering action begun in 1980 and 1981 occurred after December 7, 1985, Count III of the plaintiffs' Amended Complaint is barred by the RICO four year statute of limitations and summary judgment on this Count shall be entered in favor of the defendants and against the plaintiffs.

The motion of defendants for summary judgment is granted.