Kenneth OWENS and Curtis Owens, Plaintiffs

v.

James N. WADE, Defendant.

No. 91–1960.

United States District Court, E.D. Pennsylvania.

March 31, 1992.

MEMORANDUM AND ORDER

GAWTHROP, District Judge.

Plaintiffs in this civil RICO action allege in their complaint that the defendant,

James Wade, conspiring with Marcus A. Foster Community Health Center ("Marcus Foster"), fraudulently induced plaintiffs to lend money to Marcus Foster so that it could buy stock in Wade's company, Wade Communications Inc. ("WCI"), a cable franchise. Plaintiffs claim that, in violation of the agreement among the defendant, Marcus Foster, and plaintiffs to transfer the stock to plaintiffs, Wade and Marcus Foster have consistently refused to recognize plaintiffs' ownership interest in the stock. Plaintiffs claim that this fraudulent conduct amounts to a pattern of racketeering activity that violates the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a), (b), and (d) [1] and 18 U.S.C. § 1964(c). Before me is defendant's motion to dismiss for failure to state a cause of action under Fed.R.Civ.P. 12(b)(6). Because I find plaintiffs' claims time-barred, I shall grant defendant's motion, upon the following reasoning.

## FACTUAL BACKGROUND

Plaintiffs allege that, in May of 1982, James Wade was preparing an application to submit to the City of Philadelphia, asking for the right to construct and operate a cable television system within the City. In that context, Wade recruited numerous entities and individuals to invest money in WCI, the company formed to run the cable system. Marcus Foster's predecessor, Comprehensive Health Services Plan, Inc. ("CHSP"), decided to invest $25,000 in WCI, for which it would receive a 2½% equity interest. At the time, Curtis Owens was president of CHSP. In November 1983, almost one year after CHSP had decided to invest the money, media attention which was directed at the investment caused City Council and the Department of Health and Human Services ("HHS") to question whether the investment of program funds was an improper use of the federal funds received by CHSP.

On December 5, 1983, CHSP principals met with WCI principals to discuss the

questions raised as to the propriety of the $25,000 investment and the consequences it could have to the franchise application. At the meeting, which was attended by James Wade, Curtis Owens, and counsel for both CHSP and WCI, Mr. Wade agreed to repurchase the CHSP investment by December 31, 1983, if the $25,000 could not be replaced by proper funds. Plaintiffs claim that unbeknownst to them at the time, Wade and CHSP conspired and agreed to remove Curtis Owens as President of CHSP and from WCI's franchise application where he was listed as an owner and director. (Complaint ¶ 15).

At a meeting of the CHSP Board of Directors the next day, December 6, 1983, they discussed how to replace the $25,000 in program funding prior to the December 31, 1983 deadline. It was finally decided that Curtis Owens would personally replace the $25,000. Plaintiffs claim that CHSP agreed to transfer the actual equity ownership in WCI to Curtis Owens, but that they had all agreed that the investment would be held in CHSP's name until it was "politically feasible" to transfer it to him. This was done, say they, because Wade had made it known that he did not want media exposure to influence or taint the application. (Complaint ¶ 19). Plaintiffs claim, however, that unknown to Curtis Owens at the time, and in furtherance of the conspiracy to "freeze" him out, CHSP and Wade conspired and agreed not to transfer the investment to the plaintiff. (Complaint ¶ 20).

Plaintiffs allege that in reliance on CHSP's promise to transfer the investment in WCI to him, Curtis Owens, on December 7, 1983, took out a loan for $18,000, which was later secured by a mortgage on his brother, Kenneth's, home. Kenneth also gave his brother $7,000, to make up the balance of the $25,000. On December 15, 1983, CHSP signed a Loan Agreement and Promissory Note to Curtis Owens, promising to pay the $25,000, with interest, by

---

**1.** Although in the complaint, under the heading "Jurisdiction," plaintiffs claim that the action arises under and is brought pursuant to 18 U.S.C. § 1962(a)–(d), they plead no allegations of RICO violations under § 1962(c). Accordingly, that section will not be considered in assessing the sufficiency of plaintiff's allegations under RICO.

June 30, 1984, subject to several conditions, including the approval of the funds by HHS. In April 1984, Kenneth Owens was required to sign a Confession of Judgment in order to properly secure the $18,000 loan. Plaintiffs allege that on May 10, 1984, in reliance on CHSP's false promise to transfer to them the WCI stock, Curtis Owens gave Wade another $2,000 out of funds he received from his brother.

Later, in May of 1984, the Board of CHSP dismissed Curtis Owens as president, and terminated his employment. Plaintiffs claim that the defendants conspired to terminate Owens' position at CHSP, thereby limiting his ability to pay back the $18,000 loan. Plaintiffs claim that they would never have put up the money if they had known of the conspiracy to fire Curtis Owens. Plaintiffs allege that in furtherance of the conspiracy, Wade, in June of 1984, removed Curtis Owens, "without consideration or compensation, as a director and owner on WCI's franchise application." (Complaint ¶ 39). Shortly thereafter, in the summer of 1984, the City approved WCI's franchise application and awarded to WCI the right to operate a cable company in a certain section of the City. Plaintiffs contend that after the approval, Curtis Owens' investment in WCI, held by CHSP, greatly increased in value.

CHSP did not begin to make payments on the note in June of 1984, and since Curtis Owens was unable to repay the $18,000 loan, Kenneth Owens had to liquidate his savings so that his home would not be sold to pay off the loan. In September 1984, Curtis Owens filed suit against CHSP, alleging breach of contract and seeking repayment of the $25,000.[2] He voluntarily withdrew that suit after the defendants filed preliminary objections. Three years later, in February, 1987, (in response to a request by Kenneth Owens), one of the Chief Assistant City Solicitors responded to a request by Kenneth Owens by writing him a letter, stating that he had conducted an investigation on the Owenses'

claim that they were the rightful owners of CHSP's equity interest in WCI. He said that he had found that his review of the documents submitted by all parties, he said he found that although the documents established that Kenneth and Curtis Owens had lent money to CHSP, they did not show that either brother held or was promised an equity interest in WCI. His only recommendation to Kenneth Owens was that if he believed he was entitled to an equity interest, he should pursue his claim in court. (Letter of Eric Auerbach to Kenneth Owens, February 27, 1987, Exhibit A–1 to Complaint).

Plaintiffs claim that, on April 14, 1988, four years after the transaction, Kenneth Owens made a formal demand to the Board of CHSP to transfer the WCI investment to Curtis and him. Owens received no response from the Board itself, but did get a letter from Congressman William Gray, in May 1988, stating that he did not think he could help because the stock "is not under direct or indirect control of Marcus Foster", the successor to CHSP. (Exhibit to Plaintiff's Opposition to Defendant's Motion to Dismiss). One year later, in June 1989, plaintiffs filed suit against Marcus Foster demanding the transfer of the WCI interest to plaintiffs.[3]

On April 3, 1990, Marcus Foster filed for bankruptcy under Chapter 11; accordingly, the Owenses' suit, along with all other actions against Marcus Foster, was stayed under 11 U.S.C. § 362(d). On December 5, 1990, plaintiffs filed a motion to vacate the stay with the bankruptcy court. Meanwhile, on December 3, 1990, Marcus Foster and James Wade entered into a Purchase Agreement for the sale of the WCI stock held by Marcus Foster to Wade for $110,000. Since the Wade–Marcus Foster purchase agreement was subject to the approval of the Bankruptcy Court, Marcus Foster filed with the court a Motion for Order Approving Sale Free and Clear of Liens and Encumbrances on December 13, 1990. In the motion, Marcus Foster repre-

2. Court of Common Pleas of Philadelphia County, Civil Action No. 6036 (September Term 1984).

3. Court of Common Pleas of Philadelphia County, Civil Action No. 483 (June Term 1989).

sented to the court that there was no claim or legal action pending that would adversely affect the shares; nowhere in the motion was mentioned the Owenses' claim to the stock. Plaintiffs allege that defendant, Wade, must have known of the false assertion that no claims to the stock were pending since Paragraph 6 of the Purchase Agreement reads, "Following the execution hereof as expeditiously as possible, Seller, with the *assistance and approval of Buyer*, shall prepare and distribute all notices required under applicable law in order to obtain the Court Consent." (Emphasis added) (Exhibit A, Attached to the Complaint). Plaintiffs contend that the false bankruptcy filing was the last predicate act in defendant's attempt to deny the Owenses' claim to the WCI stock.

## DISCUSSION

### 1. *Standard for Motion to Dismiss*

For the purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must accept as true all the well-pleaded allegations in the complaint and all reasonable inferences that can be drawn from them. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). The complaint must be construed in the light most favorable to the plaintiff and can be dismissed only if the plaintiff has alleged no set of facts that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### 2. *Statute of Limitations for a RICO cause of action*

■ Defendants contend that plaintiffs' claims are barred by the statute of limitations, since any actionable conduct and injury occurred, at the very latest, in 1984, and this suit was not brought until 1991. The applicable statute of limitations for a RICO claim is four years. *Agency Holding Corp. v Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). The question here, however, is when the cause of action accrued. The Third Circuit announced the rule for when a RICO cause of action accrues in *Keystone Insurance Company v. Houghton*, 863 F.2d 1125 (3d Cir.1988):

> The limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed, unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur which are part of the same pattern. In that case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same "pattern."

*Id.* at 1130.

■ Initially, the court must determine when the plaintiffs knew or should have known that the elements of a civil RICO cause of action existed. In this assessment, plaintiffs must be aware that "*each element* comprising a RICO claim is present", although awareness "of the *legal* implication of these facts", i.e. that there is a civil RICO cause of action is unnecessary. *Id.* at 1128 (Emphasis in original). The elements of a civil RICO claim, as set forth in *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), are 1) conduct of, 2) an enterprise, 3) through a pattern, 4) of racketeering activity, 5) causing injury to plaintiffs' business or property. *Keystone, supra* at 1128; *Zappala v. Burruano*, slip. op., Civ. No. 89–4769, 1990 WL 79403 (E.D.Pa. June 8, 1990, McGlynn, J.).

The gist of plaintiffs' RICO claim is that Wade and Marcus Foster conspired to get money from plaintiffs to invest in WCI under the false pretense that Marcus Foster would transfer the ownership of its investment to plaintiffs. Plaintiffs claim that, as part of the conspiracy, the defendant and Marcus Foster agreed to deny that plaintiff had any ownership rights to the WCI stock in order to "freeze" him out, and they agreed not to transfer the stock to plaintiffs. Plaintiffs were injured be-

cause they lost the $25,000 they paid to Marcus Foster and have lost their alleged interest in WCI, which has substantially increased in value.

Defendant contends that assuming, for the purposes of statute-of-limitations analysis, that the elements of a RICO claim exist, plaintiffs' complaint reveals that plaintiffs knew or should have known that these elements existed by, at the latest, the fall of 1984. Plaintiffs knew of the conduct of an enterprise, WCI, in 1982 and 1983, when Wade was soliciting investors in order to prepare his cable franchise application to the city. Plaintiffs have alleged a pattern of racketeering, the predicate acts of which existed in 1984—the inducement to pay $25,000 to Marcus Foster, the termination of Curtis Owens' employment, the removal of his name from the franchise application as an owner or director, the granting of the franchise application, and the non-transfer of the stock to the Owenses. The Owenses' injury also occurred in 1983–84, when they paid the $25,000 and their ownership of the stock was not recognized. In 1984, plaintiffs knew or should have known of the existence and source of their injury, and they were in a position such that they knew or should have known that a predicate act causing the injury was part of a pattern of racketeering. *Keystone, supra* at 1130; *Glessner v. Kenny*, 952 F.2d 702, 708 (3d Cir.1991). After CHSP fired Curtis Owens and refused to pay any money on the $25,000 promissory note, and after Wade removed Owens as an owner or director from his franchise application and received the franchise approval from the City in the summer of 1984, the fraud scheme of the defendant to deny the Owenses' alleged ownership of the stock was fully exposed to plaintiffs. After the City granted WCI the franchise application without Owens listed as an owner, Marcus Foster did not transfer the stock, as it allegedly promised to do. Plaintiffs knew of the pattern of racketeering that had separated them from their money and denied them the WCI stock, and knew the predicate acts of the

pattern had caused them injury. The fact that Kenneth Owens waited until 1988 to make a formal demand for the stock to the Marcus Foster Board of Directors is irrelevant to what they knew or should have known in 1984, when the alleged fraudulent conduct occurred. Plaintiffs' suit against Marcus Foster on the note in September 1984 is further evidence of their knowledge that they had been injured in 1984. *See also In re Marcus A. Foster Community Health Center*, Bankruptcy No. 90–11497F, *Owens v. Miller, Trustee of Marcus Foster*, Adversary No. 91–0150F, slip. op. (E.D.Pa. Bkrty Feb. 28, 1992, Fox, J.) (opinion dismissing the claims of Curtis and Kenneth Owens against Marcus Foster for the same WCI stock, as barred by the statute of limitations and laches).

a. Last Predicate Act

Plaintiffs allege, however, that the last predicate act in furtherance of the conspiracy was the filing of the false bankruptcy petition in 1990, and claim that their RICO action is timely under the *Keystone* exception for "last predicate act." The *Keystone* rule, *supra* 863 F.2d at 1130, is that "the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same pattern."

Since the statute of limitations would begin to run in 1984, if no further predicate acts occurred, the question here is whether either of the two alleged predicate acts, occurring after the statute of limitations would have run in 1988—the Gray letter in 1989, or the false bankruptcy filing in 1990—are part of the "same pattern of racketeering activity."[4] If either one is, then the RICO cause of action would not have accrued until 1990, and plaintiff's claim would be timely.

I must analyze first the alleged predicate acts of Bill Gray's letter and the bankruptcy filing to see if they can be fairly charac-

---

4. Plaintiffs have alleged no further injury.

terized as predicate acts attributable to the defendant. Plaintiffs allege that in violation of 18 U.S.C. § 1341, the mail fraud statute, "Marcus Foster caused to be mailed, on May 5, 1988, a letter from William H. Gray, III, to K. Owens, falsely asserting that Marcus Foster did not own the WCI interest." (Complaint ¶ 67(c)). Since plaintiffs did not allege that Wade participated in the mail fraud, that predicate act can only be attributed to the defendant through a conspiracy theory. In pleading a RICO conspiracy under § 1962(d), however, the plaintiff must plead agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity. *K. Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166–67 (3d Cir.1989); *Glessner v. Kenny, supra*, 952 F.2d at 714. Since plaintiff failed adequately to allege the conspiracy elements of agreement and knowledge, the Gray letter is not a predicate act in furtherance of the conspiracy.

■ Turning to the bankruptcy filing of 1990, the language of Marcus Foster's bankruptcy court motion to approve the purchase agreement between it and Wade does show that Wade was to "assist in and approve" the bankruptcy filing. Drawing all inferences from plaintiffs' allegation in the light most favorable to plaintiffs, I find the allegation of Wade's agreement and knowledge as to the alleged falsity of the filing sufficient to attribute the predicate act to Wade under a conspiracy theory.

Next, under *Keystone*, I must determine whether the bankruptcy filing, as the last predicate act, is "part of the same pattern of racketeering activity." *Id.* at 1130. Plaintiffs allege that a pattern of racketeering activity existed under § 1962(a) and (b).[5] It is clear from the face of the complaint, however, that plaintiffs' allegations

of a pattern of racketeering activity under § 1962(a) cannot withstand a motion to dismiss, since they do not allege that they were injured specifically by the use or investment of income in any enterprise, as is required under § 1962(a). *See Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989); *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990); *Glessner v. Kenny*, 952 F.2d 702, 708–709 (3d Cir.1991) (specifically rejecting the contention that the investment injury requirement is inconsistent with the Supreme Court's decision in *Sedima, supra*, 473 U.S. at 495, 105 S.Ct. at 3284).

■ Assuming, without deciding the issue, that plaintiffs, have sufficiently alleged a pattern of racketeering activity under § 1962(b) in 1983 and 1984, the question I must decide is whether the bankruptcy filing was a part of the "same pattern of racketeering activity." In order for a predicate act to be a part of the same pattern, it must be "related" to, and there must be "continuity" with, the rest of the predicate acts in the pattern. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). Marcus Foster's filing of the allegedly false bankruptcy motion meets neither of these requirements.

The test for "relatedness" laid out in *H.J. Inc.* provides that acts are sufficiently related if they "have the same or similar purposes, results, participant, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901; *see also Banks v. Wolk, supra*, 918 F.2d at 422. At bar, plaintiffs allege that the defendant and Marcus Foster fraudulently induced them to give $25,000 to Marcus Foster, by promising plaintiffs the ownership of the invest-

---

5. Section 1962(a) provides, in pertinent part:
   It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to sue or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged ·in ... interstate or foreign commerce.

Section 1962(b) provides, in pertinent part:
   It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

ment in WCI. Plaintiffs claim the defendant and Marcus Foster never intended to turn over the stock and have denied the Owenses' claim to ownership. That alleged pattern of racketeering ended when the purpose of the conspiracy was realized—the purchase of the stock with the Owenses' funds and continued possession of the stock after the cable franchise was approved by the City. At bar, the bankruptcy filing involves the same participants—Marcus Foster and Wade, but the purpose was different. If the filing was fraudulent as plaintiffs contend, the purpose was to have the court declare a purchase of the stock by Wade to be free and clear of any encumbrances, despite the Owenses' pending claim. Plaintiffs do not allege that the goal of the racketeering activity was for *Wade* to gain control of the stock at some later point. The purpose of defendant's alleged pattern was to deny the Owenses' their claim to ownership of the WCI stock, a purpose accomplished in 1984.

While the Owenses could have been the victims of the false bankruptcy filing, if the court had not known about their pending claim, a point disputed by defendants, the filing in no way deceived them. It did not lull them into believing that Marcus Foster would turn over the stock to them; it did not create a false sense of security to postpone plaintiffs ultimate complaint to the authorities. *See Korman v. Trusthouse Forte PLC*, 786 F.Supp. 458 (E.D.Pa.1992). The bankruptcy filing was not related to the acts of 1983–84 because it was not in furtherance of the alleged conspiracy. Even if the bankruptcy filing could be related to the predicate acts of 1983 and 1984, it does not satisfy the continuity requirement needed to make it part of the "same pattern."

■ In order to satisfy the continuity requirement, a pattern must constitute a threat of continuing criminal activity or demonstrate predicates extending over a substantial period of time. *H.J. Inc., supra* at 240, 242, 109 S.Ct. at 2901, 2902. "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* The Act "clearly contemplates a prolonged course of conduct." *Keystone, supra* at 1131 (quoting *Toussie v. United States*, 397 U.S. 112, 120, 90 S.Ct. 858, 863, 25 L.Ed.2d 156 (1970)).

Plaintiffs here do not allege that the conduct of the defendant poses a threat of future criminal activity. They do not allege that the pattern of racketeering activity is a continuous part of the defendant's business, nor do they claim that the defendant defrauded any other individual or entity. *See e.g. Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1418 (3d Cir.1991), cert. denied, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007. Since plaintiffs have alleged no facts from which I may find that defendants engaged in open-ended criminal activities that pose a threat of future crimes by their very nature, I shall examine plaintiffs' allegations in the context of a closed-ended fraudulent scheme.

In a closed-ended scheme, a number of factors are relevant to a pattern's continuity inquiry. The Third Circuit has focused on the "number of unlawful acts, the number of victims, the number of perpetrators, the character of the unlawful activity, and, most importantly, the duration of the predicate acts. *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir.1987); *Kehr Packages, supra* at 1412–1413; *Hindes v. Castle*, 937 F.2d 868, 872–873 (3d Cir.1991). Not one of the post-*H.J. Inc.* cases has found continuity in a closed period with a short-lived scheme directed at a limited number of people; in every case the plaintiff alleged the threat of future continuing racketeering activity. *Hindes, supra* at 875; see also *Kehr Packages, supra* at 1413. It remains an open question in the Third Circuit whether RICO liability is ever appropriate for a single-scheme, single-victim, single-injury conduct with only two perpetrators, that threatens no future harm. *Id.; Marshall–Silver Construction Co., Inc. v. Mendel*, 894 F.2d 593, 597 (3d Cir.1990).

In the case at bar, there were two perpetrators—Wade and Marcus Foster, one vic-

tim—the Owens brothers, and one injury—the denial of the stock ownership after paying $25,000. There existed only one scheme—to get the money from Curtis Owens, but refuse to give him the stock for it. All the predicate acts alleged for this pattern of racketeering occurred from December 1983 to sometime in the fall of 1984, a period of less than one year. The only exception is the alleged last predicate act, the bankruptcy filing, which occurred six years later in 1990. In 1984, however, after the cable franchise was approved and no stock was transferred to the Owenses, the fraud had already been perpetrated, the objective of the alleged fraudulent scheme realized. There was no threat of continued activity. The bankruptcy filing merely confirmed what the plaintiffs already knew: Wade and Marcus Foster denied plaintiffs' claim to the WCI stock.

The plaintiffs' situation is similar to the one confronted by the court in *Zappala v. Burruano, supra,* slip op. Civ. No. 89–4769, 1990 WL 79403, *1 (E.D.Pa. June 8, 1990, McGlynn, J.). There, the plaintiffs claimed that an investment firm converted plaintiffs' pension plan funds to its own use rather than investing them. The court found that the plaintiffs' claim accrued in 1984, when they knew or should have known of the existence of the RICO elements. Plaintiffs claimed, however, that a financial statement issued in 1988 by the investment company in which, it was alleged, the company attempted to conceal the conversion of the funds by listing them as "capital loss." The court found that since the conversion of the plaintiffs' funds—the fraud complained of—was accomplished by 1984, and since there was no threat of continued criminal activity beyond that date, the 1988 mailing was not a "part of the same pattern" of racketeering activity. *See also Korman v. Trusthouse Forte PLC, supra* (last predicate act, which did not further scheme or deceive plaintiffs, was not in "same pattern").

I find that since the fraud was exposed to the plaintiffs by the end of 1984 and since no threat of continuing criminal activity existed, the bankruptcy filing was not "part of the same pattern of racketeering activity." Hence, the statute of limitations began running in 1984 when the plaintiffs knew or should have known of their RICO claim. Since plaintiffs did not file this RICO action until 1991, their claim is barred by the statute of limitations. Therefore, I shall grant defendant's motion to dismiss the complaint.