Douglas FINEBERG, as assignee of Nexus Management, Limited, Nexus Trustees, PLC., Raymond Shingles, and Ian Coutts, Plaintiffs,

v.

CREDIT INTERNATIONAL BANC-SHARES, LTD., Credit International Bank, N.A., Richard V. Allen, Owen J. Erickson, Edwin J. Feulner, Jr., John C. Hickman, John C. Hughes, Donald I. Hovde, Tom C. Korlogos, Charles Emmet Lucey, Charles Manatt, Donald M. Phares, and John Stuart, Defendants.

No. 93–432–RRM.

United States District Court,
D. Delaware.

June 23, 1994.

(1975); see *McGrane v. Reader's Digest,* 822 F.Supp. 1044, 1048–1050 nn. 8–10 (S.D.N.Y. 1993).

Laurence V. Cronin, and Patricia A. Garthwaite, Smith, Katzenstein & Furlow, Wilmington, DE, Robert F. Sylvia, and Evan Slavitt, Hinckley, Allen & Snyder, Boston, MA, for plaintiffs.

Gregory V. Varallo, and Lisa A. Schmidt, Richards, Layton & Finger, Wilmington, DE, for defendants Credit Intern. Bancshares,

Ltd., Credit Intern. Bank, N.A., Richard V. Allen, Edwin J. Feulner, Jr., John C. Hickman, Donald I. Hovde, Tom C. Korologos and Charles Manatt.

Michael D. Goldman, Peter J. Walsh, and Kevin R. Shannon, Potter Anderson & Corroon, Wilmington, DE, for defendant John Stuart.

## TABLE OF CONTENTS

FACTUAL BACKGROUND

A. Fall of 1985: The Initial Stages in the Development of the New Business .....341

B. March of 1986: The Nexus Loan Agreement ...............................341

C. March of 1986: The Clarification of the Nexus Loan Agreement ..............343

D. 1987: Credit International Bancshares, Ltd. is Incorporated and Warrants and Options are Granted to Board Members ...................................343

E. November of 1987: The Board's Decision to Reduce the Bank's Capitalization..344

F. January of 1989: Allen Confirms CIB's Decision on Options and Warrants and Makes a Settlement Offer to Coutts, Steere and Shingles...................344

G. May of 1990: Nexus, Coutts and Shingles notify CIB of their Intent to Sue ........................................................................345

H. September of 1993: Fineberg Files Suit...................................345

DISCUSSION

I. Jurisdiction ................................................................348

II. Summary Judgment ........................................................348

III. The Plaintiff's RICO Claim...............................................348

IV. The Plaintiff's Breach of Contract Claims ................................349
 A. The breach of contract claim based on the Nexus Loan Agreement .......350
 1. 10 Del.C. § 8109: The statute of limitations for actions arising from a promissory note or an acknowledgement under the hand of a party of a subsisting demand...............................................350
 2. sealed instrument ..............................................351
 B. The breach of contract claim based on the Commission Agreement........352

---

### MEMORANDUM OPINION

McKELVIE, District Judge.

This is an action arising out of agreements to provide funding and services for a new business. The plaintiff, Douglas Fineberg, is the assignee of the entities and persons who agreed to obtain the funding or provide those services. The corporate defendants are those new businesses, Credit International Bancshares, Ltd. ("CIB"), a bank holding company incorporated in Delaware, and its wholly owned subsidiary, Credit International Bank, N.A. ("the Bank"), a federally chartered bank with offices in Washington, D.C. The individual defendants are members of the board of directors of the parent corporation, certain officers of the subsidiary and one of the corporations' attorneys.

In a complaint filed on September 3, 1993, and amended in January of 1994, the plaintiff alleges that in 1986 his assignors entered into agreements to obtain funding and pro-

vide services in connection with the creation and establishment of CIB. He contends that while his assignors provided those services and obtained those funds, the defendant corporations have wrongfully failed to issue stock options and warrants and to pay amounts due under the agreements. He contends the defendants have breached various duties owed to his assignors in wrongfully failing to pay the amounts due and in responding to the assignors' claims and requests under the agreements, including that they have violated certain provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b)–(d).

The defendants have moved for a summary judgment that the plaintiff's claims are barred by limitations. They argue that the plaintiff's assignors were on notice of their contract and RICO claims by September of 1989 and that as the plaintiff did not file the complaint until September of 1993, the contract actions are barred by Delaware's three year statute of limitations for actions based on a contract, and the RICO claims are barred by a four year statute of limitations. The plaintiff has responded by arguing that the contract claims are not barred by limitations, as the agreements are under seal and claims based on agreements under seal are subject to a longer limitations period. While he agrees that the RICO claims are subject to a four year period for limitations, he contends they are not barred as he filed this action within four years from the date of the last predicate act which was part of the same pattern of racketeering activity.

For the reasons set out below, I will grant the defendants' motion as to the RICO claims and certain of the contract claims. I will deny the motion as to certain other contract claims.

## FACTUAL BACKGROUND

For the purposes of this motion, the court accepts the following facts as true, either because they are the version offered by the plaintiff or because they appear to be uncontradicted.

### A. Fall of 1985: The Initial Stages in the Development of the New Business

In the fall of 1985, Donald Phares, an attorney in Chicago, began to work on implementing his idea to form a new bank based in Washington, D.C. that would specialize in serving international clients and facilitating international transactions. He asked his partner Charles Emmet Lucey to outline a proposal to form and capitalize the bank, and he asked Ian Coutts, a solicitor in London, to work with them on locating persons or entities who would assist in providing the start-up funding for the bank.

### B. March of 1986: The Nexus Loan Agreement

Coutts eventually brought Phares together with Raymond Shingles and Peter Isola of Nexus Management Limited, a Gibraltar corporation, and one of his firm's clients. In March of 1986, Nexus agreed to obtain and loan $300,000 to Phares and Lucey to cover expenses to be incurred in obtaining a federal charter for the bank. This agreement with Nexus is dated as of March 27, 1986. It provides that Phares and Lucey enter into it as the initial organizers of Credit International Bank, a proposed federally-chartered bank to be located in the District of Columbia, and a proposed bank holding company which would own one hundred percent of the stock of that bank. It provides that interest on the $300,000 loan would be at 16% per annum and that Phares and Lucey would not be personally liable for the loan or the interest. Phares, Lucey and Nexus agreed Nexus would be paid a fee of $60,000 out of the $300,000.

The typed version of the agreement provides that Nexus would also receive options to purchase 120,000 shares in the holding company, and that the holding company would be limited to granting options for 200,000 shares, at an exercise price of 1/100th of the selling price on the date of issuance. A photocopy of that document appears to show the parties changed by hand the typed number for the total number of options from 200,000 to 400,000, and also changed the

number of options granted to Nexus from 120,000 to 310,000.

The agreement provides it shall be governed by the laws of Gibraltar and has the following signature page:

and all of which taken together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, Lucey and Phares have hereunto set their hands in the District of Columbia, U.S.A. and Chicago, Illinois, U.S.A., respectively, and NML has caused its common seal to be hereunto affixed in Gibraltar, all as of the date and year first above written.

INITIAL ORGANIZERS:

_____ Executed this 27th day of March.
Charles Emmet Lucey

_____ Executed this 27th day of March.
Donald M. Phares

NEXUS MANAGEMENT LIMITED

THE COMMON SEAL OF )
NEXUS MANAGEMENT LIMITED )
was hereunto affixed in )
Gibraltar on this ____ day of )
_____, 1986, in the )
presence of: )

By: _____
 Director

By: _____
 Secretary

CONFIDENTIAL

CI000102

A 155 CI002026

It appears that Phares signed the document on or about March 27, 1986. Peter Isola then signed on behalf of Nexus and Nexus' secretary placed the seal on it. The document was then delivered to Lucey who signed as of March 27th.

C. *March of 1986: The Clarification of the Nexus Loan Agreement*

By a letter dated March 27, 1986, Lucey and Phares offered clarifications to the agreement, including that the option price for the 400,000 shares would be $10 a share, that Nexus would use its best efforts to raise $12,000,000 through the sale of the bank's stock, and that as additional consideration Nexus would receive without cost 30,000 warrants for an additional 30,000 shares of stock at a price of ten cents a share. Below the signature line of this letter are the words, "AGREED," "Nexus Management Limited By:"; and a signature line with the signature of a Nexus director that appears to be Isola. The letter agreement is not under seal; that is, the word seal is not placed next to any of the signatures and there is no seal affixed or stamped on the paper.

In April of 1986, Lucey and Phares retained Coutts as legal counsel for the holding company. Lucey and Phares also designated Coutts to be responsible for all of the bank's legal work outside the United States. In return for these legal services, Lucey and Phares agreed that Coutts' law firm, Coutts Solicitors, would receive a fixed sum of $70,000 including disbursements through November, 1986.

In early 1986, Nexus obtained $245,000 of the $300,000 loan from Achates Trust Limited, of the Island of Guernsey, a corporate trust company whose managing director is Leslie Steere.

Thereafter, in June of 1986, Phares agreed with William Bowman, a client of his, that in exchange for a loan of $55,000 to the bank, Bowman would receive 1,000 warrants for stock in the bank and options to purchase 5,500 shares. Bowman wired $55,000 to the bank's account in Maryland and has offered testimony in connection with the presentation of the defendants' motions that he wired the money with the intent and understanding that his funds were part of the funds supplied by Nexus pursuant to it agreement.

By the end of 1986, Phares, Lucey and Coutts had submitted to the Comptroller of the Currency an application for a federally chartered bank, had expended $30,000, had paid Nexus its $60,000 fee, and had divided among themselves the remaining $210,000.

D. *1987: Credit International Bancshares, Ltd is Incorporated and Warrants and Options are Granted to Board Members*

On April 20, 1987, the bank holding company was incorporated in Delaware as Credit International Bancshares, Ltd. The initial board members included Phares, Lucey and Coutts. Richard Allen, Tom Korologos, John Lehman, Edwin Feulner, Jr. and Donald Hovde were also appointed to the board. On May 4, 1987, the participants received preliminary approval from the Comptroller of Currency to organize a national bank, which they did and which they called Credit International Bank, N.A.

In a letter dated May 5, 1987, it appears Lucey notified Coutts that all of the directors who were investing time and effort in the creation of the bank "would be entitled to 10,000 warrants for 10,000 shares and options for 15,000." In June or July, Coutts, Phares and Lucey apparently entered into a supplemental oral agreement with Nexus that it would receive a 6.25 percent cash commission on, and options to purchase five percent of, the number of shares of stock it sells.

On July 27, 1987, Phares, Coutts and Lucey met in Washington, D.C. with members of CIB's board of directors, including Allen, Korologos, and Lehman. Two other board members, Feulner and Hovde, participated by telephone. Included among others at the meeting were Charles T. Manatt and John F. Stuart, attorneys with the law firm Manatt, Phelps. The minutes of the meeting show that the board ratified the Nexus agreements, that is the two March 27, 1986, agreements and the June or July, 1987, commission agreement.

By a letter dated July 23, 1987, Lucey informed Nexus that the board had ratified the commission agreement. Lucey requested that someone at Nexus sign the notification letter in the space provided and return a copy of it to him. It appears that someone

at Nexus signed this letter on August 7, 1987, and mailed a copy of the executed letter to Lucey.

On July 24, 1987, CIB issued an offering memorandum for domestic purchases of the stock. The memorandum included the following description of its agreements with Nexus and Coutts: 1) the interest rate on the $300,000 loan is sixteen percent per annum from December 1, 1986; 2) Coutts would be entitled to 25,000 options on shares; and 3) Nexus had been granted options for 50,000 shares and warrants for 30,000 shares.

In September, 1987, Coutts, on behalf of Nexus, met with Khalid Mezran, and discussed Mezran's interest in investing $1,000,000 in the bank. Subsequently Mezran purchased $500,000 in stock.

### E. November of 1987: The Board's Decision to Reduce the Bank's Capitalization

The board met again in November of 1987. Those present included Allen, Feulner, Hovde, Korologos, Lehman, and Phares. Dr. El-Alfi, a consultant, attended this meeting, as did Manatt and Stuart. During the meeting and in response to Phares' motion, the board voted to reduce the bank's capitalization from $40,000,000 to $20,000,000, and to reduce the outstanding warrants and options on the same basis. Three days later, on November 20, 1987, CIB issued an international offering memorandum that described the Nexus agreement. This memorandum stated that Nexus had obtained $300,000 for the organization of the bank, and in return had been granted an option for 25,000 shares of stock, and warrants for 15,000 shares. It also disclosed that Coutts had been granted warrants for 10,000 shares and that Shingles, as a member of the board, had been granted 1,000 warrants at the rate of one warrant for one share at a price of ten cents a share.

Thereafter, and by a letter dated November 26, 1987, Coutts wrote to Stuart to report that the international offering memorandum incorrectly described the Nexus agreements and the number warrants and stock options due it. He informed Stuart that Nexus is "entitled by contract to 30,000 warrants and a minimum of 55,000 stock options." Stuart responded to Coutts by a letter dated November 30th and reported to him that the memorandum was not in error as the board of directors had reduced all warrants and options by fifty percent.

A year later, on November 11, 1988, the bank's board of directors cancelled all of the options and warrants previously granted to members of the board. Allen, Phares, Manatt, Korologos and Feulner attended that meeting, Coutts and Singles did not.

### F. January of 1989: Allen Confirms CIB's Decision on Options and Warrants and Makes a Settlement Offer to Coutts, Steere and Shingles

In January of 1989, Allen met with Coutts and Steere in London and offered to settle Nexus and Coutts' claims, with the bank paying Nexus $240,000, plus interest at seven percent, and paying Coutts $25,000. In sworn testimony before this court on April 29, 1994, Allen maintained that at this meeting he informed Coutts and Steere that the "Board (was) not disposed to grant any warrants or options." D.I. 128 at 14. Thus, Allen testified that Coutts and Steere knew the board of directors had cancelled options and warrants "no later than very early 1989." Id. at 11.

In February, the Comptroller of the Currency issued a national charter to the bank.

In a letter dated February 9, 1989, Allen informed Shingles of the board's offer to pay Nexus $240,000 plus interest at seven percent dating from December 1, 1986. By letter dated February 15, 1989, Shingles acknowledged receipt of the offer and rejected it, contending Nexus was entitled to 1) $300,000 with interest at the rate of sixteen percent dating from December 1, 1986; 2) 30,000 warrants for 30,000 shares of stock in the holding company at a warrant price of ten cents per share; 3) unspecified stock options and 4) a 6.25 percent cash commission on and options to purchase five percent of the shares of CIB stock Nexus sold. More specifically, Shingles claimed Nexus was entitled to $31,-

250 and 2,500 stock options in connection with stock sold to Mezran. The next day Allen replied by withdrawing the settlement offer, disavowing all options and warrants purportedly due to Nexus and its affiliates and denying Nexus's claim for a commission on the sale of shares to Mezran.

In a letter dated June, 1989, Coutts reported to Phares that he had not been receiving copies of the minutes of board meetings. On June 28th a bank officer sent copies of the minutes of a number of board meetings to him, including the minutes of the November 11, 1988, meeting. Coutts received these minutes in July of 1989.

On August 9, 1989, Coutts sent $1,000 to the bank to acquire 10,000 warrants. On September 9, 1989, a bank officer wrote to Coutts, reported that the bank would not be issuing the warrants to him, and returned the $1,000 to him.

In April of 1990, Coutts brought an action against CIB in the High Court of Justice in London for fees and services performed for it based on a January, 1987 agreement with Phares. In papers filed in that case, Coutts reported that he had been assured his fees and expenses would be paid following the opening of the bank. Coutts apparently voluntarily terminated that action sometime in 1992.

G. *May of 1990: Nexus, Coutts and Shingles notify CIB of their Intent to Sue*

On May 10, 1990, Jerold Solovy, an attorney in Chicago, wrote to Manatt, on behalf of Nexus Management, Coutts and Shingles in connection with their claims against CIB and reported that, as to "various obligations that have not been paid including warrants and stock options.... [W]e believe that our clients have meritorious claims against the company, certain of its officers and its directors." Solovy met with Donald Phares on June 5th and reviewed his clients' claims, reported that he was prepared to file an action against the directors, and discussed a settlement of those claims.

On September 28, 1990, Erickson sent Bowman a fully executed Settlement Agreement providing that in consideration for the $55,000 lent to the bank in 1986, Bowman received options and warrants from Phares and 5,500 shares of CIB stock.

H. *September of 1993: Fineberg Files Suit*

In late August of 1993, CIB announced plans to enter into a merger agreement with Sequoia Federal Savings Bank.

Douglas Fineberg filed this action on September 3, 1993, and named as defendants Credit International Bancshares, Ltd., Credit International Bank, N.A., Richard V. Allen, Owen J. Erickson, Edwin J. Feulner, Jr., John C. Hickman, John C. Hughes, Donald I. Hovde, Tom C. Korologos, John F. Lehman, Jr., Charles Emmet Lucey, Charles Manatt, Donald M. Phares, John Stuart and Manatt, Phelps & Phillips. In the complaint Fineberg alleged that he was the assignee of the plaintiffs' claims and interests and that the defendants had wrongfully conspired to deprive Nexus Management, Nexus Trustees, Shingles, Coutts Solicitors and Coutts of money, stock options, and warrants and to take their services without payment. He alleged that CIB had wrongfully breached the loan and commission agreements and had wrongfully failed to pay fees and expenses due Coutts Solicitors; that the directors had wrongfully breached duties owed to Coutts and Shingles by acting to deprive them of the stock options and warrants; that Manatt, Stuart and their law firm breached duties owed to Coutts and Shingles in rendering advice and services to the board; and that the defendants' actions constituted a continuing fraud violating RICO.

CIB, the Bank, Allen, Feulner, Hickman, Hovde, Korologos, Lehman, Manatt, Stuart and Manatt, Phelps & Phillips appeared and moved to dismiss the complaint on a number of grounds. Lucey, Phares, Erickson and Hughes failed to appear.

On December 8, 1993, the court granted summary judgment for CIB and the bank on Coutts' claims for fees and costs, and for all

of the moving defendants on the balance of the tort claims, finding that the acts complained of took place prior to September 3, 1990, and that the claims were, therefore, barred by limitations.

On January 14, 1994, Fineberg filed an amended complaint seeking damages for CIB's alleged breach of the Nexus loan agreement, its breach of the Nexus commission agreement, and alleging the defendants participated in a pattern of racketeering activity and seeking damages under RICO. With regard to conduct by the defendants that fell within four years of the filing of his complaint, Fineberg alleged:

(i) On or about September, 1990, Phares used the telephone to speak to William Bowman in furtherance of the defendants' fraud.

(j) On or about September 28, 1990, Erickson transmitted by mail a document entitled 'Settlement Agreement' containing false statements and in furtherance of the defendants' fraud.

(k) On December 20, 1993, Stuart transmitted both by mail and by telephone facsimile a letter containing false statements and in furtherance of prior fraudulent activity.

D.I. 73 at 17.

In the complaint, the plaintiff fails to state with particularity what the false statements are in Stuart's December 20, 1993, letter. Here is a copy of that letter:

# MANATT, PHELPS & PHILLIPS

A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

## ATTORNEYS AT LAW

JOHN F. STUART
DIRECT DIAL (202) 463-4250

1200 NEW HAMPSHIRE AVENUE N.W., SUITE 200
WASHINGTON, D.C. 20036-6989
TELEPHONE (202) 463-4300 FAX (202) 463-4394

11355 WEST OLYMPIC BOULEVARD
LOS ANGELES, CALIFORNIA 90064-1614
TELEPHONE (310) 412-4000
FAX (310) 312-4224

53 MUSIC SQUARE WEST, SUITE 104-B
NASHVILLE, TENNESSEE 37203-3228
TELEPHONE (615) 269-1240
FAX (615) 256-1282

December 20, 1993

<u>VIA TELECOPY # 617-345-9020</u>

Evan Slavitt, Esq.
Hinckley, Allen & Snyder
One Financial Center
Boston, MA 02111-2625

Dear Mr. Slavitt:

This is in reply to your letter of December 15, 1993 which has been referred to me for comment.

In regard to the purported transfer by the William E. Bowman Trust of certain securities of Credit International Bancshares, Ltd., please be advised as follows:

(i) 5,500 shares of common stock - pursuant to the terms of Mr. Bowman's agreement with CIB, such shares are not transferable without their registration under the Securities Act of 1933 or appropriate exemption therefrom. If your client is asserting that the transfer was pursuant to applicable exemption, an opinion letter from counsel for the Bowman Trust will be required before any transfer is effected. Further, we are still reviewing the implications of Mr. Bowman's recent affidavit and its effect on the 5,500 shares which were provided in settlement. In the event that counsel to the Bowman Trust provides an opinion in form acceptable to CIB's counsel with respect to the transfer, CIB reserves its rights to require the posting of an appropriate bond to secure itself.

(ii) warrant for 1,000 shares of common stock - the warrant by its terms is non-transferable and, therefore, the security is not in registered form and CIB has no obligation to effect any transfer. Further, the books and records of CIB indicate that all warrants granted to Donald Phares were in fact exercised by him some time ago. In short, Mr. Phares, even if he was legally able, did not have executory warrants to transfer to Mr. Bowman.

(iii) option for 25,500 shares of common stock - the stock option by its terms is non-transferable and, therefore, the security is not in registered form and CIB has no obligation to effect any transfer.

MANATT, PHELPS & PHILLIPS

Evan Slavitt, Esq.
December 20, 1993
Page 2

Finally, in regards to the shareholders' meeting, we have reviewed your assertions regarding the proxy statement and we believe that there is no reasonable basis for them. Indeed, they appear to evidence lack of reasonable inquiry. If you should pursue these groundless allegations, CIB will defend them vigorously.

Very truly yours,

John F. Stuart
Manatt, Phelps & Phillips

cc: John V. Pollock

---

The defendants have moved again to dismiss or for summary judgment on the ground that the plaintiff's claims are barred by the applicable statute of limitations.

*DISCUSSION*

I. *Jurisdiction*

The court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

II. *Summary Judgment*

Summary judgment is appropriate when the evidence offered demonstrates that there is no genuine issue of material fact in dispute and no jury could reasonably find by a preponderance of the evidence that the nonmoving party is entitled to judgment in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating a lack of genuine issue of fact. Accordingly, courts must read the record in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to

which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

III. *The Plaintiff's RICO Claim*

RICO's civil enforcement provision, 18 U.S.C. § 1964(c), does not have an express statute of limitations. However, the parties agree consistent with the case law that the limitations period applicable to a civil RICO action is four years. *See Glessner v. Kenny*, 952 F.2d 702 (3d Cir.1991) (citing *Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987)).

The Third Circuit has articulated the following standard for the accrual of a civil RICO action:

(T)he limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of a civil RICO cause of action existed unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, in which case, the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or

last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same "pattern."

*Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1130 (3d Cir.1988); *See also Glessner v. Kenny,* 952 F.2d 702 (3d Cir.1991).

 The elements of a civil RICO claim are conducting an enterprise through a pattern of racketeering activity and causing an injury to the plaintiff's business or property. *Korman v. Trusthouse Forte PLC,* 786 F.Supp. 458 (1992). Thus, the civil RICO statute of limitations accrues on the date the plaintiff knew or should have known of his injury and that the injury was part of a pattern of racketeering. *Keystone,* 863 F.2d at 1130, *See also Bivens Gardens Office Bldg., Inc. v. Barneti Bank,* 906 F.2d 1546 (11th Cir.1990).

 As the plaintiff filed the original complaint in this case on September 3, 1993, claims which accrued prior to September 3, 1989, will be time barred. The court finds that by November 30, 1987, the date Stuart informed Coutts that all options and warrants had been reduced by fifty percent, the plaintiff's assignors knew or should have known that they had been injured by the defendants, and by July, 1989, after Allen met with Coutts and Steere and wrote to Shingles in February, 1989, and after Coutts received the minutes of the November 11, 1988, meeting of the board of directors, they knew or should have known the extent of their injuries identified in the amended complaint and that they were part of a pattern they now contend are racketeering activities.

The plaintiff contends, however, that two predicate acts occurred after September 3, 1989: first, on September 28, 1990, Erickson mailed Bowman the Settlement Agreement; and second, on December 20, 1993, Stuart responded to Slavitt's December 15, 1993, letter.

 In order for a predicate act to be part of the same pattern of racketeering activity it must be "related to" and there

must be a "continuity. with" the pattern of racketeering activity. *Korman,* 786 F.Supp. at 458 (citing *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989)). While the Bowman Settlement Agreement and the Stuart letter may be related to the transactions that are the subject of this case in the sense that they speak to the same subject matter, neither fits into a continuity of a pattern of racketeering activity. While Bowman was involved in the initial efforts to obtain funds for CIB, he is not a party to this action, he has not assigned any claims to the plaintiff, and he has not alleged that he was fraudulently induced into signing the agreement. While the plaintiff questions the accuracy of the facts as agreed to by CIB and Bowman as the basis for their agreement, he has not shown he has been harmed or would be harmed by the agreement as to those facts. Similarly, the Stuart letter is nothing more than Stuart's response to plaintiff's counsel's invitation for a further dialogue on the June, 1986 transaction between Phares and Bowman and the September, 1990 Settlement Agreement between CIB and Bowman.

Neither the Settlement Agreement or the Stuart letter fit into the continuity of the allegedly fraudulent pattern of racketeering the plaintiff has identified as a basis for relief. That activity ceased by July of 1989, when the plaintiff's assignors were on notice as to the basis of their claims. As Solovy's May, 1990 letter confirms, they were on notice as to the basis for their claims well before Bowman settled or Stuart wrote his letter.

For these reasons, the court will enter a summary judgment in favor of the defendants and against the plaintiff on the plaintiff's civil RICO claims in count III of the amended complaint.

## IV. *The Plaintiff's Breach of Contract Claims*

In the amended complaint the plaintiff identifies two breach of contract claims against CIB: 1) an alleged breach of the

Loan Agreement as signed and amended and 2) an alleged breach of the Commission Agreement.

■ Where claims, such as these, do not arise under the Constitution, treaties, or laws of the United States, a federal court must apply the limitations period that "a similar state forum would apply." *D'Angelo v. Petroleos Mexicanos,* 398 F.Supp. 72, 78 (D.Del. 1975).

The defendants contend that 10 *Del.C.* § 8106 bars the plaintiff's contract claims. It reads:

### § 8106. Actions subject to 3 year limitation

No action to recover damages for trespass, no action to regain possession of personal chattels, no action to recover damages for the detention of personal chattels, no action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject however, to the provisions of §§ 8108–8110, 8119 and 8127 of this title.

10 *Del.C.* § 8106.

The defendants contend that under Delaware law, a cause of action for breach of a contract accrues at the time of the breach, *Allstate Ins. Co. v. Spinelli,* 443 A.2d 1286, 1292 (Del.1982), and that § 8106 bars the plaintiff's claims as his assignors knew or should have known that the defendants breached their contractual duties prior to September 3, 1990.

### A. *The Breach of Contract Claim Based On The Nexus Loan Agreement*

The plaintiff articulates two reasons why the Court should find the contract claims based on the Loan Agreement are not time barred. He contends that these claims arose from a promissory note and "an acknowledgement under the hand of the party of a substituting demand" and consequently are subject to the six year statute of limitations found in 10 *Del.C.* § 8109, rather than the three year statute of limitations in 10 *Del.C.* § 8106. Alternatively, he contends the Loan Agreement is a sealed instrument and is subject to a longer statute of limitations, either Delaware's twenty year statute of limitations or Gibraltar's twelve year statute of limitations for actions on sealed instruments.

1. *10 Del.C. § 8109: The statute of limitations for actions arising from a promissory note or an acknowledgement under the hand of a party of a subsisting demand*

Delaware's statute of limitations for actions arising under a promissory note or an acknowledgement under the hand of a party of a subsisting demand, reads:

### § 8109. Bills and notes

When a cause of action arises from a promissory note, bill of exchange, or an acknowledgement under the hand of the party of a subsisting demand, the action may be commenced at any time within 6 years from the accruing of such cause of action.

10 *Del.C.* § 8109. The plaintiff argues that his claims based on the Loan Agreement arise from either a promissory note or an acknowledgement under the hand of a party of a subsisting demand, and that because he filed his complaint in September, 1993, he asserted his claims within six years from the accruing of the cause of action.

■ The term "promissory note" is not defined in 10 *Del.C.* § 8109. However, Delaware has adopted the Uniform Commercial Code which provides that a writing is defined as a "note" if it is "a promise other than a certificate of deposit." 6 *Del.C.* § 3–104(2)(d). The Delaware UCC defines a promise as "an undertaking to pay and must be more than an acknowledgement of an obligation." 6 *Del.C.* § 3–102(1)(c). A "note" as defined above constitutes a negotia-

ble instrument under the Delaware UCC. *See* 6 *Del.C.* § 3–104.

Courts have defined a "promissory note" as a written promise by one person to pay another person, absolutely and unconditionally, a sum certain at a specified period of time. *Saunders v. Stella,* 1989 WL 89518, 1989 Del.Super. LEXIS 316; *Smith v. Union State Bank,* 452 N.E.2d 1059, 1062 (1983). The court observes that this definition of a promissory note is the same as the statutory definition of a "negotiable instrument" under the Delaware Uniform Commercial Code. *See* 6 *Del.C.* § 3–104(1) and (2).

The Loan Agreement does not set forth an unconditional promise by the defendants to pay the plaintiffs $300,000 on a certain date. Consequently, it is not a promissory note to which the six year statute of limitations found in 10 *Del.C.* § 8109 applies.

■ An "acknowledgement" is defined as "an instrument which by its terms clearly recognizes or admits the existence of a prior claim or debt...." *Mykulak v. Collins,* 301 A.2d 313, 316 (Del.Super.Ct.1973); *National Iranian Oil v. Mapco Int'l Inc.,* 825 F.Supp. 77, 79 (D.Del.1993). In order to be entitled to the six year statute of limitations in 10 *Del.C.* § 8109 an acknowledgement must be in writing, under the hand of a party, of a subsisting demand, upon which the action is founded and must in itself establish the plaintiff's claim or cause of action. Victor B. Woolley, *Woolley's Practice In Civil Actions* § 518 (1985); *See Security Storage Co. v. Equitable Security Trust Co.,* 51 Del. 410, 147 A.2d 507, 509–511 (1958) (stating that the intent of the General Assembly with regard to 10 *Del.C.* § 8108, the predecessor of 10 *Del.C.* § 8109, was that it apply "to suits arising from the obligations directly created from the instruments themselves...."); *Boston v. Bradley,* 4 Del. (4 Harr.) 524, 527–528 (Del.Super.1847) ("(t)he acknowledgement in writing under the hand of the party of a subsisting demand, upon which the action is founded, must in itself establish the plaintiff's claim or cause of action.").

■ The plaintiff contends that certain papers prepared by and for CIB are acknowledgements under 10 *Del.C.* § 8106 as they are dated and set forth both the amount of the debt and the names of the payee and the debtor. It appears the plaintiff is referring to documents such as the November 20, 1987, Offering Memorandum. It reads:

> Nexus Management ... advanced $300,000 (inclusive of a fee of $60,000) to pay certain organizational expenses of the Bank. Such indebtedness plus interest from December 1, 1986 will be repaid from the proceeds of the Combined Offering.

D.I. 124, Deposition Exhibit 150.

The plaintiff has not, however, claimed a right to sue based on documents such as the November 20, 1987, Offering Memorandum. Rather, this cause of action is based upon the Loan Agreement and CIB's alleged breach of its obligations under that agreement. Consequently the six year statute of limitations in 10 *Del.C.* § 8109 does not apply.

### 2. *sealed instrument*

■ The plaintiff next contends that the Loan Agreement is a sealed instrument and therefore is subject to Delaware's twenty year common law period of limitations for actions on sealed instruments. *See DiBiase v. A & D, Inc.,* 351 A.2d 865, 867 (Del.Super.1976). The parties agree that Gibraltar's statute of limitations for actions to enforce an obligation created or secured by an instrument under seal is twelve years. D.I. 122, Legal Opinion by Louis Triay at § 10; D.I. 114, Affidavit of David Dumas at § 6. Where, as here, a cause of action arose outside of the State of Delaware, Delaware has a statute that mandates which statute of limitations to apply. It reads:

### § 8121. Cause of action arising outside State

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action

arose, for bringing an action upon such cause of action.

10 *Del.C.* § 8121. Thus, in the event the Loan Agreement is determined to be a sealed instrument, the court would apply Gibraltar's shorter twelve year statute of limitations.

■ In order to resolve the defendants' motion for summary judgment the court must determine whether the Loan Agreement is a sealed instrument. As it contains a provision stating that "(t)his Agreement shall be governed by the Laws of Gibraltar," the court agrees with the parties that the question of whether the loan agreement is a sealed instrument is a matter of Gibraltar law. D.I. 120, Nexus Loan Agreement at A154; *See also American Telephone & Telegraph Company v. Harris Corp.,* 1993 WL 401864, 1993 Del.Super. LEXIS 307.

On this issue, the plaintiff submitted the affidavit of Louis W. Triay, a Member of the Honourable Society of the Middle Temple and a Queens Counsel of the Gibraltar Bar. In his affidavit dated February 4, 1994, Triay states that Gibraltar law recognizes by statute that companies such as Nexus, which are registered and incorporated under the laws of Gibraltar, may make contracts on behalf of the company in writing and under the common seal of the company. D.I. 122, Legal Opinion by Triay at § 4 (citing Companies Ordinance Section 29(1)). Triay further states that,

> the common seal of the Company shall not be affixed to any instruments except by authority of a resolution of the Board of Directors and in the presence of a Director and the Secretary or such other persons as the Directors may appoint for that purpose; and that Director or the Secretary or other person as aforesaid shall sign every instrument to which the Seal of the Company is so affixed in their presence.

Id. at § 5. If a seal has been affixed to a contract in accordance with the requirements articulated above, Triay states that the contract shall bind all the parties to the contract. *Id.* at § 7. In conclusion, Triay contends that the Loan Agreement satisfies the re-

quirements articulated above and consequently is, in his opinion, a sealed document subject to Gibraltar's twelve year statute of limitations for contracts under seal. *Id.* at 12.

In support of their position that the Loan Agreement is not a sealed document, the defendants submitted the affidavit of David Dumas, a Barrister of the Supreme Court of Gibraltar and a member of the Honourable Society of the Middle Temple, dated April 25, 1994. In this affidavit Dumas reports that under Gibraltar law a document is a "deed", an instrument under seal, if: 1) it is written on parchment or paper; 2) sealed; and 3) delivered. D.I. 114, Dumas Affidavit at § 5. Dumas further observes that although it is common for a deed to bear as many seals as there are parties, the parties can agree to adopt the seal of one party as long as all the parties evidence their intent to adopt this seal. *Id.* at § 9 and § 11. Dumas offers his opinion that the Nexus Loan Agreement is not a document under seal.

In response to Dumas' affidavit, the plaintiff's filed the supplemental affidavit of Louis W. Triay, dated April 29, 1994. In this affidavit Triay states that the parties intention to execute a sealed instrument, as evidenced by the format of the contract, the form of the attestation clause and other matters, is an important factor in deciding whether the instrument is sealed.

The affidavits submitted by the parties fail to provide the court with a clear understanding of the requirements under Gibraltar law for an agreement to be executed under seal. For these reasons, the court is unable to determine whether or not the Loan Agreement is a sealed instrument. Therefore, the court will deny the defendants' motion for summary judgment on the claims in count I of the amended complaint.

B. *The Breach of Contract Claim Based On The Commission Agreement*

■ The defendants contend that the July 23, 1987, Commission Agreement is not a document under seal and consequently the three year statute of limitations in 10 *Del.C.*

§ 8106 applies to bar the plaintiff's breach of contract claim based on this agreement.

In his affidavit Dumas states that if the parties to a document under seal alter it by a separate document with terms that are severable from the first, a presumption arises that the second document is not a sealed instrument. D.I. 114 at § 13. Thus, the defendants contend that even if the court determines that the Loan Agreement is an instrument under seal, the separate Commission Agreement is not a sealed instrument unless evidence exists which indicates that it is. As no evidence exists indicating that the Commission Agreement is a document under seal, the defendants maintain that the Commission Agreement is subject to the three year statute of limitations found in 10 *Del.C.* § 8106. It appears that the plaintiff has not provided the court with briefing on this issue.

The court finds that the Commission Agreement dated July 23, 1987, is separate and distinct from the Loan Agreement as it was created approximately sixteen months after the March 27, 1986, execution of the Loan Agreement and does not mention that agreement. *See* D.I. 120 at A189. Thus, in order for the Commission Agreement to constitute a sealed instrument evidence must exist demonstrating that the parties intended it to be a sealed instrument. As the Commission Agreement is not sealed by either of the two signatories of the document, Lucey or Shingles, and as the agreement contains no indication whatsoever that either party intended the document to be sealed, the court finds that the Commission Agreement is not a sealed instrument. Thus, the Commission Agreement is not entitled to the extended statute of limitations for documents under seal but rather is subject to the three year statute of limitations found in 10 *Del.C.* § 8106.

The court observes that on February 16, 1989, Allen wrote to Shingles informing him that the CIB denies Nexus's claim for a commission on the sale of shares to Mezran. D.I. 124, Exhibit 26. Thus, by the end of February, 1989, the court finds that Nexus had notice of CIB's alleged breach of the Commission Agreement. Because the plaintiff filed the original complaint in this action on September 3, 1993, the court holds that the plaintiff's breach of contract claim with regard to the Commission Agreement is barred by the three year statute of limitations found in 10 *Del.C.* § 8106. For these reasons, the court will enter a summary judgment in favor of the defendants and against the plaintiff on the claims in count II of the amended complaint.

The court will issue an Order in accordance with this Opinion.